**BAYSTATE TECHNOLOGIES, INC., Plaintiff,**

v.

**Harold L. BOWERS, d/b/a HLB Technology, Defendant.**

**No. Civ.A. 91–40079–NMG.**

United States District Court, D. Massachusetts.

Dec. 17, 1999.

Louis M. Ciavarra, George B. Sanders, Jr., Bowditch & Dewey, Worcester, MA, Robert M. Asher, Lee C. Bromberg, Robert L. Kann, Julia Huston, Bromberg & Sunstein, Boston, MA, for Bay State Technologies, Inc., plaintiff.

Robert E. Strauss, Plante, Strauss, Vanderburgh & Connors, Santa Ana, CA, Frederick M. Meeker, Banner & Witcoff, Washington, DC, Dale A. Malone, Banner & Witcoff, Ltd., Boston, MA, Steve S. Chang, Banner & Witcoff, Ltd., Washington, DC, Gregory J. Cohan, Banner & Witcoff, Boston, MA, for Harold L. Bowers, defendant.

Dale A. Malone, Banner & Witcoff, Ltd., Boston, MA, for Harold L. Bowers, counter-claimant.

Louis M. Ciavarra, George B. Sanders, Jr., Bowditch & Dewey, Worcester, MA, Julia Huston, Bromberg & Sunstein, Boston, MA, for Bay State Technologies, Inc., for counter-defendant.

## MEMORANDUM AND ORDER

GORTON, District Judge.

This case involves the interpretation of U.S.Patent No. 4,933,514 ("the '514 Patent"), a patent held by Harold L. Bowers, d/b/a HLB Technology ("Bowers"). On May 16, 1991, plaintiff Baystate Technologies, Inc. ("Baystate") filed a complaint against Bowers seeking a declaratory judgment that 1) its products do not infringe the '514 Patent, 2) the '514 Patent is invalid and 3) the '514 Patent is unenforceable. Bowers filed counterclaims for patent infringement, copyright infringement and breach of a licensing agreement.

Baystate subsequently amended its complaint to add additional claims. Pending before this Court are cross motions for summary judgment on every claim and counterclaim and a variety of other motions related to discovery and pre-trial matters. This memorandum will address only the cross motions for summary judgment related to patent infringement.

The patent in dispute concerns the design of a template and digitizing tablet to simplify the operation of computer aided design ("CAD") software. Both Bowers and Baystate manufacture and sell such templates.

## I. *Background*

### A. *The '514 Patent*

Bowers invented, produced and sold a template that he marketed under the name Cadjet. Cadjet was intended to simplify the use and operation of a particular CAD program called Cadkey. He applied for and received a patent for his invention, the '514 Patent.

In general, CAD programs allow an individual to prepare blueprints, mechanical drawings and other designs on a computer. Cadkey is a sophisticated computer software program that, similar to most software programs, is menu-driven, meaning that a user accesses the program's features by selecting commands from menus.

Selecting a specific command from a menu often brings up another menu from which the user can make another selection. For example, Cadkey contains eight "Main Menus", denominated "CREATE", "CONTROL", "TRANSFORM", "EDIT", "DISPLAY", "DETAIL", "DELETE" and "FILES". A user who wants to draw a line would first click on the "CREATE" menu and be presented with a list of the various figures that can be "created", e.g. "Line", "Circle", "Arc", etc. The user may then select "Line" and be presented with another menu listing different kinds of lines, whereupon he/she may select the specific line desired and the computer will draw it.

Following this process through the menus can be time-consuming. Bowers' product (Cadjet) is an attempt to simplify use of the program. It relies on a computer device known as a "digitizing tablet," which plugs into the computer as does a keyboard or a mouse. A digitizing tablet is a two-dimensional work surface above an electrical grid used for detecting the location of a pointing device. Each square on the grid is assigned a particular task the computer can perform. A user who wants the computer to perform a specific task places the pointing device (which bears some resemblance to a computer mouse) on the appropriate location on the digitizing tablet and clicks a button. This is an alternative to selecting the command by using a mouse or keyboard entry to maneuver through the program's menu hierarchy displayed on the computer screen.

Bowers' patented product is a template, or overlay, that is placed on top of the digitizing tablet to provide the user with a visual indication of where to move the pointing device in order to activate a desired function. The template contains small symbols and words, referred to in the '514 Patent as "indicia", which correspond to the various functions the computer can perform. A separate software program provides the link between the computer and the tablet, assigning each

computer command to a particular grid on the tablet.

The template presents a visual array of many of the commands a user may access through Cadkey's menus. The template essentially takes the menus from the computer program and spreads them out on the template in front of the user in order to save the user the need to search through the on-screen menu hierarchy to perform a function. Rather, the user can immediately select the desired function from among the indicia on the template. For example, a user who wants to draw a line can simply place the pointing device on the square depicting the kind of line he/she wants to draw, rather than progress through three levels of menus on the computer screen to find the desired command.

Bowers' '514 Patent describes the manner in which Cadkey's commands are organized and presented on the template. The preferred embodiment (the Cadjet template) is actually a "grouping of templates" because the product consists of two layers of templates. The bottom template contains a grid of rectangular blocks organized into groups of boxes, each group being identified by a particular color. A second, transparent template is affixed on top of the lower template and contains "indicia," which are words and icons printed in black to indicate where a user should point on the template to activate a desired function.

By using two templates, the user of the Bowers invention is able to reduce the cost of updating the product each time the computer program is revised. Modifying the product simply requires replacing the top black and white transparent overlay while leaving the color template in place. This significantly reduces reprinting costs of the more expensive color template each time the program is modified.

Baystate's product, DRAFT–PAK, is similar to Bowers' Cadjet product both in design and function. DRAFT–PAK, like Cadjet is a template that allows a user to implement the various commands of the Cadkey design software by using a digitizing tablet.

## B. *Prosecuting the '514 Patent*

Bowers filed the original patent application with the United States Patent and Trademark Office ("the PTO") in 1989. The PTO issued the '514 Patent in 1990. The instant litigation was commenced in 1991 and Bowers filed a request for reexamination of the '514 Patent with the PTO in 1993 to consider the patent in light of previously undisclosed prior art. The request was granted shortly thereafter.

The Patent Examiner issued an Official Action on July 13, 1993 rejecting Bowers' efforts to distinguish the '514 Patent claims from the prior art. Bowers then amended his claims and argued against the rejection. The Examiner issued a Second Official Action on April 1, 1994 and rejected the claims on the basis of obviousness in light of the prior art. Although Bowers offered another amendment and again argued against rejection, the Examiner issued a Third and Final Official Action on October 5, 1994 reiterating his rejection on the grounds that Bowers' claims were obvious in light of the prior art.

Bowers filed a response and supplemental affidavit and the Examiner issued an advisory action on January 5, 1995 maintaining the rejection and setting the time for appeal. After both Bowers and the Examiner submitted briefs, the PTO Board of Appeals issued an opinion on September 10, 1996, reversing the Examiner and reissuing the '514 Patent. A Reexamination Certificate issued with the amended claims.

The reexamination proceeding considered the validity of the '514 Patent in light of previously undisclosed prior art, the Keymaster template. The Keymaster template essentially performs the same function as the device disclosed in the '514 Patent, i.e. it is a template for use with a digitizing tablet that contains words and

symbols representing the various menu commands of the Cadkey program. The Keymaster template and the device disclosed by the '514 Patent both organize the commands into groups distinguished by color.

During the reexamination proceeding Bowers distinguished his invention from Keymaster based upon the manner in which he arranged the commands on his template. The Examiner acknowledged one difference between Claim 1 of the '514 Patent and Keymaster, but concluded that it would have been obvious to one skilled in the art to make the modification so disclosed. The PTO Board of Appeals rejected that conclusion and noted that Bowers pointed out other differences which the Examiner did not consider.

## C. *The Current Lawsuit*

■ The essential issue with respect to claim construction in this litigation is the manner in which Bowers attempted to distinguish the Keymaster template during the reexamination process. Patent law limits the interpretation of claim terms so as to exclude any interpretation that the patentee disclaimed during prosecution. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d at 1570, 1576 (Fed.Cir. 1995). Therefore, this Court must construe the claims to be consistent with any statements made by Bowers during the reexamination proceedings that indicate his intent about the meaning and scope of the words in the claims.

■ Baystate offers a claim interpretation that it argues is required by virtue of Bowers' stated limitations disclosed during the reexamination proceedings. Bowers counters that Baystate's contention misinterprets the prosecution history and improperly limits the patent. Furthermore, Bowers argues that Baystate's interpretation cannot be correct because it would render the only embodiment of his disclosed invention outside of the patent claims. In *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996),

the Federal Circuit held that an interpretation of a patent that renders the preferred embodiment outside the scope of the patent claim is "rarely, if ever, correct and would require highly persuasive evidentiary support."

## D. *The Claim*

Claim 1 of the reexamined patent reads as follows:

1. In a computer system including a central processing unit having a keyboard entry station with a plurality of keys for data entry and a pointing device station having a pointer with at least one pointer button for data entry and responsive to positionable movement of said pointer, and including system operating functions having successive layers of a main menu of selectable group functions and successive series of a first layer of sub-menus, and at least a second sub-layer of sub-menus having selectable group sub-functions, accessible by successive entries on said keyboard or said pointer to select an ultimate working function, the improvement comprising:

a. a template for use with said pointing device

b. indicia arranged on the template and located in a plurality of groups, one group of each corresponding to one predetermined, selectable item of said main menu and all said indica (sic) in a responsive group bearing a common group identifying characteristic;

c. at least a second plurality of indicia, each of which corresponds to a predetermined selectable item of a sub-menu corresponding to an item of said main menu;

d. means securing said templates in a fixed orientation to said tablet whereby said pointing device can select a working function with a single movement of the said button.

The parties dispute the meaning of subsections b, c and d.

## II. *Claim Interpretation*

### A. *Legal Principles of Claim Construction*

■ The determination of a patent infringement claim requires a two-step analysis. First, the court must construe the asserted claims to determine their meaning and scope. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir.1996). Only then may the trier of fact determine whether the properly interpreted claims encompass the accused structure. *Id.*

■ Claim construction is a question of law for the Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (en banc). The objective of claim construction is to ascertain the meaning that a person of ordinary skill in the art would give to the terms in dispute at the time of the application for the patent. *Wiener v. NEC Electronics, Inc.*, 102 F.3d 534, 539 (Fed.Cir.1996); *see Haynes International, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578 n. 4 (Fed.Cir.1993). To ascertain the meaning of claim language, the Court looks initially to the three sources of intrinsic evidence of record: 1) the claims themselves, 2) the specification, to the extent that it defines terms in a manner inconsistent with their ordinary meaning, and 3) the prosecution history of the patent, to the extent that it contains the patentee's express representations with respect to the scope of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Drawings from the specification may be used in interpreting the scope of a claim. *See* 5 Donald S. Chisum, *Patents* § 18.03[2][c][iii] at 18–108 (1998) (citing cases).

■ Claim construction begins with the wording of the claims, asserted and non-asserted, which are to be examined in their entirety. *Bell Communications Research,*

*Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). Unless the specification or the prosecution history indicates that the inventor expressly intended otherwise, a claim term will be accorded its ordinary and accustomed meaning. *Id.; Markman*, 52 F.3d at 979 (stating that "a patentee is free to be his own lexicographer" but that "any special definition given to a word must be clearly defined in the specification").

■ The Court may look to extrinsic evidence, such as expert testimony, dictionaries and learned treatises, to understand the technology and to construe the claims, only if the claims are ambiguous and only after consideration of all available intrinsic evidence. *See Vitronics*, 90 F.3d at 1584. Extrinsic evidence, however, may not be used to vary or contradict the terms of the claims. *Markman*, 52 F.3d at 981.

■ While claims are to be interpreted in light of the specification and with a view to ascertaining the invention, *see Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561–62 (Fed.Cir.1991), it does not follow that limitations from the specification should be read into the claims. *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed.Cir. 1988). Therefore, it is generally improper to limit the scope of the claim to examples used in the specifications. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed.Cir. 1994).

### B. *Discussion*

The parties in this case contest the meanings of several phrases used in Claim 1, specifically, those phrases in Claim 1, subsections (b), (c) and (d) and the statements made to the PTO during the reexamination proceedings related to those claim sections.

#### 1. *Claim 1(b)*

##### a. *The Original Claim*

For the most part, the parties do not dispute what the language of Claim 1(b)

means. Instead, they disagree about the scope of the claim's application. The dispute devolves to whether the limitations contained in Claim 1(b) apply to *every group* on the template (Baystate's contention) or only to *some of the groups* (Bowers' contention).

Baystate argues that the phrase in Claim 1(b) "one group of each corresponding to one predetermined, selectable item of said main menu", means that every group on the template must correspond to a Main Menu item in the corresponding software. Baystate notes that DRAFT–PAK contains groups for "View" and "Mask" that are not Cadkey Main Menu items.

Similarly, Baystate contends that Claim 1(b) requires that the indicia located within a particular group on a template must all be contained under the same item of Cadkey's Main Menu. For example anything located within the "Create" group on the Cadjet template must be found under Cadkey's "Create" menu. Baystate points out that DRAFT–PAK contains a function called "Calculate" within its "Files" group even though "Calculate" is not a function under the "Files" menu of Cadkey.

Moreover, Baystate asserts that every command that can be found within a particular menu on Cadkey must be grouped together on the template and share the same "group identifying characteristic." Baystate notes that DRAFT–PAK splits Cadkey's detail menu into two separate groups called "Detail/Set" and "Detail/Change."

Bowers does not contest Baystate's interpretation of the claim but rather argues that the limitations contained in it do not apply to every group on a template. Bowers asserts that the '514 Patent requires only that at least two groups meet the claim's limitations. He relies on the phrase "plurality of groups," which precedes and describes the phrases for which Baystate offers its interpretation discussed above. For example, Bowers argues that "plurality of groups" describes the phrase

"one group of each corresponding to one predetermined, selectable item of said main menu", i.e. that each of at least two groups, but not all of the groups, must correspond to one predetermined, selectable item of the Main Menu.

■ "Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *York Products v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1572 (Fed.Cir.1996); *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir. 1995); *Markman,* 52 F.3d at 980 (a patentee is free to be his own "lexicographer" but any special definitions must be clearly defined in the specification). The '514 Patent contains no alternative definition for the term "plurality" and this Court will, therefore, apply the ordinary meaning of the term.

The dictionary definition of "plurality" is "the state or fact of being plural", American Heritage Dictionary Third Edition 1053 (3d ed.1997), and "plural" is defined as "[o]f, relating to or being a grammatical form that designates more than one of the things specified." *Id.* at 1052. Nowhere in either definition is there an indication that "all" of a particular thing is specified. The Court therefore agrees with Bowers' contention that the language of Claim 1(b) requires only that more than one group must correspond to a Main Menu item.

Bower's position is bolstered by the language contained in the specification. The specification states that indicia are arrayed "in a plurality of groups, each of which corresponds to a predetermined selectable item of the main menu." U.S.Patent No. 4,933,514 at "Brief Statement of the Invention", Column 2, lines 12–14. Although Bowers used different language in the actual claim, a claim is to be interpreted in light of the specification contained in the patent. *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561–62 (Fed.Cir.1991). The specification of the '514 Patent clearly

calls for a template on which a plurality of groups exists, each of which correspond to a Main Menu item. A template containing two or more groups, where each of those groups correspond to a Main Menu item would satisfy this limitation. Claim 1(b) does not call for a template in which all groups correspond to Main Menu items.

Bowers offers an additional persuasive argument in support of his interpretation of "plurality". Accepting Baystate's interpretation would render the preferred embodiment outside the scope of the patent. If Claim 1(b) were construed to require that every group on the template correspond to a Cadkey Main Menu item, the preferred embodiment elaborated in the '514 Patent would fall outside the scope of the patent because the preferred embodiment (the Cadjet template) contains some groups that are not on Cadkey's Main Menu. It is clear that an interpretation of a patent that renders the preferred embodiment outside the scope of the patent claim is "rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996). The only evidence that Baystate offers in support of such a "rare" interpretation is Bowers' statement to the PTO during the reexamination proceedings. As explained in the following subsection, Bowers' statement during reexamination proceedings is misinterpreted by Baystate and this Court will not, therefore, construe the '514 Patent claims in such a way as to render them outside the scope of the preferred embodiment.

b. *The Claim Post–Reexamination*

Baystate contends that its interpretation of the claim is required by virtue of Bowers' statements during the reexamination proceedings before the PTO. The statement on which Baystate relies was as follows:

"Each of the groups of the Keymaster template does not correspond to one selectable item of the main menu of the

Cadkey system. To illustrate, the SELECT group which is beneath the Position group on the Keymaster template is in the last sub-menu in the Cadkey system from which one selects the active function . . ." (Bowers' Appellant Brief on Appeal to the PTO found at Tab 30, p. 5 of Exhibits to Bowers' Motion for Partial Summary Judgment on the Issue of Patent Infringement).

In the second sentence, Bowers attempted to distinguish the Keymaster prior art. The Keymaster contained a group called "Select." That group was not, however, a Main Menu item in Cadkey, but rather was accessible lower down in the program's menu hierarchy.

Baystate interprets the statement made at Reexamination as meaning that Claim 1(b) requires that every group of indicia on the template must correspond to a Main Menu item in the application. It contends that Bowers distinguished the Keymaster template because the "Select" group of that template was not part of Cadkey's Main Menu. Bowers responds that he merely told the PTO that "no group on the Keymaster template meets his claim limitations" and then discussed "Select" as an example.

The dispute turns on whether Bowers' phrase "each of the groups . . . does not correspond" means "every group must correspond" (as Baystate contends) or "no groups correspond," (as Bowers contends). Contrary to both contentions, the Court finds that the phrase means only that all of the groups on the Keymaster template do not correspond to one selectable item of the Cadkey Main Menu.

When Bowers stated, "[e]ach of the groups of the Keymaster template does not correspond to one selectable item of the Main Menu of the Cadkey system," he apparently meant that 1) not all of the Keymaster's groups correspond to Cadkey's Main Menu functions and 2) some groups do correspond to Cadkey Main Menu functions, while others do not. By

referring to an example of the "Select" group which did not correspond to a Main Menu function, Bowers was citing to the PTO an example of at least one group on the Keymaster template that did not correspond to a Cadkey Main Menu function. He could have pointed out other Keymaster groups that do correspond to Cadkey Main Menu functions because there are several present on the Keymaster template.

This Court concludes that Baystate misconstrues Bowers' Reexamination statement and finds that Claim 1(b) requires only that a plurality, or more than one, of the groups meet its limitations.

### 2. Claim 1(c)

■ The dispute with respect to Claim 1(c) involves, to a great extent, the divergent interpretations of Claim 1(b). Specifically, the parties dispute whether the limitations contained in Claim 1(c) apply to *all* of the groups on the template (Baystate) or only to *some* of the groups on the template (Bowers).

Because the Court has already determined that the term "plurality" means "more than one," there is no need to elaborate on that point here. Based upon the analysis used in the interpretation of Claim 1(b), the Court applies the same meaning to the terms contained in Claim 1(c). Thus, "plurality" as used in Claim 1(c) again means "more than one."

Claim 1(c) provides for a "second plurality of indicia, each of which corresponds to a predetermined selectable item of a sub-menu . . ." Baystate asserts that that claim limitation applies to *all* functions on the template, but Bowers responds that it requires only that *all of a second plurality of indicia* meet the claim limitation.

The plain language of Claim 1(c) requires that a plurality, or more than one, of the indicia contained in a second level of indicia correspond to a predetermined selectable item of a sub-menu. The Court interprets Claim 1(c) in conjunction with Claim 1(b) and finds the former to be consistent with the latter. Thus, within the two or more groups meeting the limitations of Claim 1(b), more than one of the indicia contained in a second level of indicia must correspond to a predetermined selectable item of a sub-menu.

When Claim 1(c) is read in conjunction with Claim 13 (a claim added during the reexamination proceedings), it is apparent that the sub-menu to which the second plurality of indicia described in Claim 1(c) corresponds is the first sub-menu of a Main Menu item. This is so because Claim 13, as expressed in the Reexamination Certificate, states that the second plurality described in Claim 1 "corresponds to. the predetermined selectable item of. said first sub-layer of sub-menus . . . ."

For example, if a template contains a "Create" group, which corresponds to a Cadkey Main Menu function, more than one of the indicia in the second level contained within that group must correspond to a selectable item of the first sub-menu under "Create." The first sub-menu under "Create" includes "Lines", "Arcs", "Circles", "Points/Conics", "Polygon/Fillet" and "Splines". Therefore, within the "Create" group, in order to meet the limitations of Claim 1(c), the second level of indicia must contain an indicia for at least two of those functions.

Again, consistent with Claim 1(b), the terms of Claim 1(c) must be met in two or more groups that correspond to Main Menu items. Therefore, Claim 1(c) requires that in the groups described by Claim 1(b), there must be a second level of indicia in which more than one of those indicia correspond to an item contained in the first sub-menu of that Main Menu item.

### 3. Claim 1(d)

■ The parties' dispute over Claim 1(d) relates to the language "said pointing device can select a working function with a single movement of the button." Baystate

argues that Claim 1(d) should be interpreted to mean that all indicia on the template must activate an ultimate working function.

Bowers responds, citing *Vitronics*, that Baystate's interpretation cannot be correct because it would render the preferred embodiment outside the scope of the patent. Bowers argues persuasively that the preferred embodiment contains several items that pull up sub-menus rather than activate a function.

Once again, a patent interpretation that renders the preferred embodiment outside the scope of the patent claim is "rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996). Baystate's interpretation that would require all indicia on the template to lead to the performance of a function would thrust the preferred embodiment outside the scope of the patent claim. Without clear evidentiary support, a court cannot accept such an interpretation. *Id.*

Baystate offers only Bowers' reexamination proceeding statement in support of its contention that "the claim precludes indicia which cause a menu to be pulled down." Bowers stated during Reexamination that the capability of "said pointing device can select a working function with a single movement of the button" was "not present in each of the groups of the Keymaster template." Appellant's Brief on Appeal at 7, found at Exhibit 30 to Memorandum in Support of Defendant/Counter–Plaintiff's Motion for Partial Summary Judgment on the Issue of Infringement of Defendant/Counter–Plaintiff's Patent. It does not necessarily follow from this representation that Bowers' claim requires all indicia on his template to activate a function with a single movement of the pointing device.

This Court concludes that Bowers reexamination statement did not limit Claim 1(d) to require all indicia to activate a working function. There is no evidentiary support for Baystate's argument that the Court interpret the patent to exclude the preferred embodiment. The phrase "said pointing device can select a working function with a single movement of the button" will, therefore, be interpreted to mean that the pointing device can, but need not, select a working function with a single movement of the button.

### C. Conclusion on Claim Interpretation

Based upon the preceding analysis, this Court concludes that, with respect to contested terms as they are used in claim 1 of the '514 Patent:

1) "indicia arranged on the template and located in a plurality of groups, one group of each corresponding to one predetermined, selectable item of said main menu" means that at least two groups must appear on a template, where one group corresponds to a Main Menu item and the other corresponds to another Main Menu item;

2) "at least a second plurality of indicia, each of which corresponds to a predetermined selectable item of a sub-menu corresponding to an item of said Main Menu" means that at least two indicia contained in the second set of indicia contained within one of the "at least two groups of indicia" described in Claim 1(b) must correspond to an item of the first sub-menu of the Main Menu item to which the group corresponds; and

3) "said pointing device can select a working function with a single movement of the said button" means that the single movement of the pointing device's button can, but need not, select a working function.

### III. Summary Judgment

#### A. Summary Judgment Standard

Entry of summary judgment of infringement or non-infringement is proper when there is no genuine issue of material fact and, given proper construction of the pat-

ent, a finding of infringement or non-infringement is possible. *Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1986). Ordinarily, the question of infringement is one for the jury. When the relevant material facts are not genuinely in dispute, however, the question of literal infringement becomes one of claim construction and is appropriate to deal with on a summary judgment motion. *Athletic Alternatives, Inc. v. Prince Mfg.,* 73 F.3d 1573, 1578 (1996). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

B. *Discussion*

 Here both parties have moved for summary judgment. Bowers has moved for summary judgment of infringement and Baystate has moved for summary judgment for non-infringement of Bowers' '514 Patent. The parties argue that there are no material facts genuinely in dispute. Bowers asserts that "[i]f the Court rules against Baystate on these claim interpretation issue[s], Baystate's entire Partial Summary Judgment motion [on infringement] must be denied and Mr. Bowers['] motion granted." Similarly, Baystate urges that "the features of the accused structures ... are not in dispute...." Each party, however, has submitted a volume outlining alleged "undisputed facts," which, upon examination, reveal many disputed facts. Ultimately, the Court's

interpretation of Claim 1 differs slightly from those proffered by either party. The Court declines, therefore, to grant summary judgment in favor of either Baystate or Bowers.

Accordingly, Plaintiffs Motion for Partial Summary Judgment of Non–Infringement of Reexamined U.S.Patent No. 4,933,514 (Docket No. 129) is **DENIED** and Defendant/Counter–Plaintiff's Motion for Partial Summary Judgment on the Issue of Patent Infringement of Defendant/Counter–Plaintiff's Patent (Docket No. 125) is **DENIED.**

The Court is, nevertheless, mindful of the parties' desire to resolve the issue of patent infringement and the parties are therefore directed to submit, within thirty (30) days of the date of this Order, memoranda of law (not to exceed fifteen pages) on the propriety of summary judgment in light of the Court's construction of Claim 1 as set forth above. As a result of this Order, the Pre–Trial Conference scheduled on December 21, 1999 and the commencement of trial scheduled to begin on January 10, 2000 are hereby postponed and a Status Conference is scheduled for February 9, 2000 at 3:30 p.m.

So ordered.